**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JOHN BATTIES, et al.,

                Plaintiffs,

      v.

WASTE MANAGEMENT OF
PENNSYLVANIA, INC.,

                Defendant.

Civil Action No. 2:14-cv-07013-PD

The Honorable Paul S. Diamond

## <u>ORDER</u>

AND NOW, this ___ day of _____, 2015, upon consideration of Plaintiffs'
Motion for Class Certification and Defendant Waste Management of Pennsylvania, Inc.'s Brief
in Opposition thereto, it is hereby ORDERED that the Motion is DENIED.

BY THE COURT:

_____
The Honorable Paul S. Diamond, U.S.D.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JOHN BATTIES, et al.,

               Plaintiffs,

     v.

WASTE MANAGEMENT OF
PENNSYLVANIA, INC.,

               Defendant.

Civil Action No. 2:14-cv-07013-PD

The Honorable Paul S. Diamond

---

**<u>DEFENDANT WASTE MANAGEMENT OF PENNSLVANIA, INC.'S
BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

SAUL EWING LLP

  /s/ John F. Stoviak
John F. Stoviak, Esquire
PA Atty. I.D. 23471
Cathleen M. Devlin, Esquire
PA Atty. I.D. 73680
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Telephone: 215-972-1095
Facsimile: 215-972-1921
jstoviak@saul.com
cdevlin@saul.com

Attorneys for Defendant
Waste Management of Pennsylvania, Inc.

Dated: August 28, 2015

# TABLE OF CONTENTS

I.   INTRODUCTION AND SUMMARY OF ARGUMENT. ................................................. 1

II.  SUMMARY OF KEY FACTS. ................................................................................... 8

   A.   THE TULLYTOWN LANDFILL AND WMPA'S HOST FEE PAYMENT OBLIGATIONS. ............... 8

   B.   WMPA'S 1998 SETTLEMENT IN *CARNIVAL V. WMX TECHNOLOGIES, INC., ET AL.* ................. 9

   C.   PADEP'S 2014 NOTICE OF VIOLATION ISSUED TO WMPA AND THE CONSENT
        ASSESSMENT OF CIVIL PENALTY. ......................................................................... 10

   D.   ALTERNATIVE ODOR SOURCES IN THE PROPOSED CLASS AREA. ................................. 11

   E.   PLAINTIFFS' PROPOSED CLASS REPRESENTATIVES. .................................................. 12

        1.   John Batties: *Carnival* Settlor With No Complaints. ................................ 12

        2.   Caroline Smith: Enjoys Living in Florence. ............................................... 13

        3.   Sharon Mack: Only Mildly Inconvenienced. ............................................. 14

        4.   Shirl Lynn Birely: Renter No More in the Proposed Class Area. .................. 15

III. QUESTIONS PRESENTED. ................................................................................... 15

IV.  ARGUMENT. ........................................................................................................ 16

   A.   REQUIREMENTS FOR CLASS CERTIFICATION PURSUANT TO FED. R. CIV. P. 23. ............... 16

   B.   PLAINTIFFS' PROPOSED CLASS REPRESENTATIVES ARE INADEQUATE AND HAVE
        CLAIMS, AND ARE SUBJECT TO DEFENSES, THAT ARE NOT TYPICAL OF PROPOSED
        CLASS MEMBERS, WHICH PRECLUDES CLASS CERTIFICATION. ................................... 18

        1.   The Proposed Class Representatives Have Either Suffered No Damages Or, At
             Worst, Slight Inconveniences. ................................................................. 18

        2.   One Proposed Class Representative Does Not Even Reside in the Proposed Class
             Area. ..................................................................................................... 19

        3.   Certain of the Proposed Class Representatives Have "Come to the Nuisance." ...... 20

        4.   Certain of the Proposed Class Representatives Are Subject to the 1998 *Carnival*
             Release. ................................................................................................. 21

   C.   INDIVIDUALIZED QUESTIONS OF LAW AND FACT AMONG PROPOSED CLASS MEMBERS
        OVERWHELMINGLY PREDOMINATE OVER COMMON ISSUES, WHICH PRECLUDES CLASS
        CERTIFICATION. ................................................................................................. 23

        1.   Individualized Questions As to Odor Impacts and Nuisance. ...................... 25

        2.   Individualized Determinations as to the Effect of the 1998 *Carnival* Settlement
             and Release. ........................................................................................... 28

        3.   Individualized Determinations as to Equitable Estoppel Based Upon Receipt of
             "Host Fee" Disbursements. ....................................................................... 29

        4.   Individualized Questions and Issues as to Assessment of Damages. ............. 31

D.     PLAINTIFFS' PROPOSED CLASS IS NOT ASCERTAINABLE, WHICH PRECLUDES CLASS
CERTIFICATION. ................................................................................................ 33

E.     PLAINTIFFS' PROFFERED EXPERT OPINIONS AND REPORTS FAIL TO SURVIVE THE
RIGOROUS ANALYSIS REQUIREMENT OF RULE 23, THEREBY FAILING TO SUPPORT CLASS
CERTIFICATION. ................................................................................................ 35

**V.   CONCLUSION.** ................................................................................................ **36**

1767578.5 08/28/2015

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Benton v. Kernan,*
    21 A.2d 755 (N.J. Super. Ct. App. Div. 1941).........................................................................20

*Byrd v. Aaron's Inc.,*
    784 F.3d 154 (3d Cir. 2015)..................................................................................................33

*Carlisle Area Sch. v. Scott P. By & Through Bess P.,*
    62 F.3d 520 (3d Cir. 1995), *as amended* (Oct. 24, 1995) ...........................................11

*Carrera v. Bayer Corp.,*
    727 F.3d 300 (3d Cir. 2013)..................................................................................7, 16, 34

*Cnty. of Berks v. Allied Waste Indus. Inc.,*
    66 Pa. D. & C. 4th 429 (Pa. Ct. Com. Pl. 2004) .........................................................3, 11, 25

*Elite Sportswear Products, Inc. v. New York Life Ins. Co.,*
    No. 05-cv-5181, 2006 WL 3052703 (E.D. Pa. Oct. 24, 2006) ...............................................21

*Erie Telecomm., Inc. v. City of Erie,*
    659 F. Supp. 580 (W.D. Pa. 1987).........................................................................................30

*Grandalski v. Quest Diagnostics Inc.,*
    767 F.3d 175 (3d Cir. 2014)..................................................................................................33

*Grubb v. Nucor Steel Mansion,*
    No. 3:14-cv-158, slip op. (N.D. Oh. Aug. 24, 2015) .............................................................23

*In re Hydrogen Peroxide Antitrust Litig.,*
    552 F.3d 305 (3d Cir. 2008).........................................................................1, 2, 34, 35

*Karpiak v. Russo,*
    676 A.2d 270 (Pa. Super. 1996).......................................................................18, 19, 25

*Lyons v. Twp. Of Wayne,*
    888 A.2d 426 (N.J. 2005).......................................................................................................20

*Marcus v. BMW of N. Am., LLC,*
    687 F.3d 583 (3d Cir. 2012)..............................................................................................18, 23

*McGowan Investors LP v. Keefe Bruyette & Woods, Inc.,*
    540 F. Supp. 2d 571 (E.D. Pa. 2008) ....................................................................................21

*Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co.*,
    No. 12-3824, 2013 WL 6145117 (E.D. Pa. Nov. 20, 2013) ...............................17, 18

*Neale v. Volvo Cars of North America, LLC*,
    No. 14-1540, 2015 WL 4466919 (3d Cir. July 22, 2015)...........................2, 17, 23

*Newtown v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001)..............................................................................18

*In re OSB Antitrust Litig.*,
    No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) ...........................17, 23

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994).................................................................................35

*Plaza 22, LLC v. Waste Mgmt. of Louisiana, LLC*,
    No. 13-618-SDD, 2015 WL 1120320 (M.D. La. Mar. 12, 2015)........................34

*Ritti v. U-Haul International, Inc.*,
    No. 05-4182, 2006 WL 1117878 (E.D. Pa. April 26, 2006)..............6, 17, 18, 20, 32

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ..................................................................................1, 16

*Waschak v. Moffat*,
    109 A. 2d 310 (Pa. 1954) ..................................................................................20

*Weber v. Pieretti*,
    178 A.2d 92 (N.J. Super. Ct. Ch. Div. 1962).....................................................20

**Statutes**

53 P.S. § 4000.1301 ...................................................................................................8

**Rules and Other Authorities**

Black's Law Dictionary (7th ed. 1999).....................................................................22

Federal Rule of Civil Procedure 23(a) .........................................................16, 17, 18

Federal Rule of Civil Procedure 23(b).........................................................16, 17, 23

Restatement (Second) of Torts §§ 821B .....................................................................3

Restatement (Second) of Torts §§ 821F .............................................................18, 19

Restatement (Second) of Torts §§ 822........................................................................3, 25

# I.  INTRODUCTION AND SUMMARY OF ARGUMENT.

Justice Scalia declared in 2011 in *Wal-Mart Stores, Inc. v. Dukes* that the class action mechanism is "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' . . . Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." 131 S. Ct. 2541, 2550, 2551 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).

Consistent with this approach, the U.S. Court of Appeals for the Third Circuit evaluates motions for class certification with a high degree of rigor. For instance, in *In re Hydrogen Peroxide Antitrust Litigation*, then-Chief Judge Scirica vacated and remanded certification of a class, concluding that the district court had applied an improperly lenient proof standard and had failed to adequately consider the expert opinion of the defendant manufacturer's economist. 552 F.3d 305, 321, 326-27 (3d Cir. 2008). In so holding, the Court noted the necessity of rigorous consideration of evidence presented at the class certification stage:

> The evidence and arguments a district court considers in the class certification decision call for rigorous analysis. A party's assurance to the court that it intends or plans to meet the requirements is insufficient. *See* [*Newtown v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 191 (3d Cir. 2001)] ("[W]here the court finds, on the basis of substantial evidence as here, that there are serious problems *now appearing,* it should not certify the class merely on the assurance of counsel that some solution will be found.") (quoting *Windham v. Am. Brands, Inc.,* 565 F.2d 59, 70 (4th Cir. 1977) (quotation marks omitted); *Wachtel v. Guardian Life Ins. Co.,* 453 F.3d 179, 184, 186 (3d Cir. 2006) (the requirement that a district court include in its class certification order "a clear and complete summary of those claims, issues, or defenses subject to class treatment" provides for the "full and clear articulation of the litigation's contours at the time of class certification").

*Id.* at 318. The Third Circuit further pronounced an exacting standard for consideration of class certification motions:

> Class certification requires a finding that each of the requirements of Rule 23 have been met. *See* [*Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005)] ("The plain text of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification.") . . . Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. In other words, *to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23.*

*Id.* at 320 (emphasis added).

In a similar vein, Judge Smith, writing for a unanimous panel of the Third Circuit, recently applied this rigorous standard and vacated and remanded a grant of class certification in *Neale v. Volvo Cars of North America, LLC,* No. 14-1540, 2015 WL 4466919, at *17 (3d Cir. July 22, 2015). In so doing, the Court observed:

> "[T]he party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence her compliance with the requirements of Rule 23." [*Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015)]. A district court must rigorously analyze the evidence used to establish class certification in order to ensure compliance with Rule 23(a) and at least one of the subsections of Rule 23(b). *This rigorous analysis may require the district court to address, at least in part, the merits of a plaintiff's underlying claim because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." Id.* (quoting *Wal-Mart*, 131 S. Ct. at 2552).

*Id.* at *13 (emphasis added).

Here, rigorous consideration of Plaintiffs' Motion for Class Certification reveals that Plaintiffs have failed to meet the strict standard applied in the Third Circuit for certifying a class pursuant to Fed. R. Civ. P. 23. In particular, Plaintiffs have failed to demonstrate that: (a) the named Plaintiffs are adequate class representatives; (b) the named Plaintiffs' claims are typical of those of members of the proposed class; (c) common questions and issues of fact and law predominate over individualized issues; and (d) the proposed class is ascertainable.

2

Plaintiffs have presented the Court with a "cookie-cutter" brief in support of their Motion offering nothing more than conclusory and unsubstantiated supposition, and relying on purported "expert reports" that merely set forth the *future intentions* of their "experts" to gather facts and develop opinions. In so doing, Plaintiffs impermissibly ask the Court to *assume* that Plaintiffs will develop necessary evidence at some future point in time. While Plaintiffs' so-called "expert reports" outline plans for future preparation of air dispersion modeling analyses and future evaluation of allegations of negligence, they wholly fail to contain any substantive expert opinions substantiating Plaintiffs' claims *now*.

By way of example, Plaintiffs' nuisance claims against Defendant Waste Management of Pennsylvania, Inc. ("WMPA") require proof that each member of Plaintiffs' proposed class has suffered a "*significant*" and "*unreasonable*" interference of a "*continuing nature*" which produces a "*permanent or long-lasting effect*" due to alleged odors from the Tullytown Resource Recovery Facility Landfill (the "Tullytown Landfill"). *See* Restatement (Second) of Torts (the "Restatement") §§ 821B, 822; *Cnty. of Berks v. Allied Waste Indus. Inc.*, 66 Pa. D. & C. 4th 429, 445-46 (Pa. Ct. Com. Pl. 2004); Pls.' Motion at 9-11. Nevertheless, Plaintiffs' purported experts have offered no opinions furnishing any support for these claims. One of these purported experts, Bard Horton, admitted at his deposition that he does "not currently" have any professional opinion as to whether there is an odor issue at the Tullytown Landfill. Horton Dep., Ex. 1, at 13:2-5. The other purported expert, David Weeks, admitted that he has not yet performed any air dispersion modeling analysis for the Tullytown Landfill. Weeks Dep., Ex. 2, at 8:6-15. Both experts admitted that they have never visited the Tullytown Landfill nor the proposed class area, have not reviewed any records in the files of the Pennsylvania Department of Environmental Protection ("PADEP") – the agency that permits and regulates operations at

3

the Tullytown Landfill – nor have attempted to speak with any PADEP regulators, and have not reviewed the substantial materials produced by WMPA in this action. Horton Dep., Ex. 1, at 13:10-22; Weeks Dep., Ex. 2, at 12:9-11; 13:7-16; 16:14-18; 23:23-24:7.

By contrast, WMPA has furnished the Court with the expert opinions and reports of Richard Roddewig, Thomas Rappolt and Dr. Pamela Dalton. *See* Exs. 3, 4, 5. Under the same class discovery time limits, WMPA's experts completed the necessary fact investigation and research, fieldwork, and analysis to offer substantive expert opinions establishing that individualized issues as to whether alleged Tullytown Landfill odors cause any "significant" and "unreasonable" interference of a "continuing" or "permanent" nature predominate this case. For example, Mr. Roddewig, WMPA's nationally-recognized real estate appraisal expert, invested the time to research, analyze and view the proposed class area and concluded:

- First, *there are no uniform, consistent, and common class-wide real estate appraisal methods to measure the impairment, if any, to the properties comprising the proposed Class.* The generally accepted methods of the real estate appraisal profession recognize that the *use, enjoyment, marketability, and real property impairments must be analyzed and determined on a specific neighborhood by neighborhood and property by property basis* within the sub-markets that comprise the real estate market in the proposed Class area;

- Second, *there are wide variations in the location, environmental, physical, use, and demographic characteristics of the various neighborhoods and properties in the proposed Class area. This includes wide variability in any levels of the "noxious odors, pollutants, and air contaminants" alleged to be emanating from the Landfill as well as variability in the proximity of homes in the proposed Class area to other potential sources of odors, pollutants and air contaminants.* There are also significant differences between the four specifically identified Class Representative properties and the rest of the residences in the proposed Class area. All of that means that *properties in the proposed Class area have not suffered uniform, consistent, and common class-wide impairment as measured by a common method of measuring impairment*;

- Third, . . . *[a]ny environmental condition associated with living in areas near the Landfill is just one among a multitude of factors that may affect the prices and rents in the area. The impact of contamination or other environmental conditions must be determined in each specific case, on the basis of evidence from the actual marketplace of buyers, sellers and renters . . . . There is no "one-size fits all" appraisal or real estate analytical model that can automatically or accurately determine impairment to the properties on a class wide or even sub-class wide basis*;

- Fourth, the host fees paid by the operators of the Landfill result in direct payments to many property owners, especially Tullytown [Borough] property owners, in the proposed Class area and also significantly reduce property taxes in some portions of the proposed Class area. Again, this requires neighborhood by neighborhood, property by property, and in some cases year by year analysis to determine how those payments and property tax benefits may offset some or all of the alleged adverse impact, if any, of the Landfill on home values and use and enjoyment.

*See* Expert Report of Richard Roddewig ("Roddewig Report"), Ex. 3, at ¶¶ 8-11.

Likewise, Mr. Rappolt, WMPA's seasoned air dispersion modeling expert, developed a preliminary air dispersion model demonstrating that "the maximum potential [odor] impact at locations within the Proposed Class Area occurred at different times, which indicates different experience for the putative class members impacted during each event based on their location. Rather than one or a few events being the worst for all receptors, there were a total of 146 distinct times that resulted in the worst odor for one or more receptors . . . *Of these times, no single date/hour resulted in an impact on more than 2.7 percent of the Proposed Class Area.*" Expert Report of Thomas Rappolt ("Rappolt Report"), Ex. 4, at 24 (emphasis added).

These unrefuted opinions of WMPA's experts Messrs. Roddewig and Rappolt show that individualized questions as to whether a given proposed class member has suffered any significant and unreasonable interference in the use and enjoyment of their property of a continuing and long-lasting nature will predominate over any common questions in this action, precluding class certification. These expert opinions likewise leave no room for doubt that any

1767578.5 08/28/2015

attempt to prove any such actionable interference would require individualized mini-trials that will inevitably cause this proposed class action to "deteriorate into an unmanageable mass of individual claims and defenses." *See Ritti v. U-Haul International, Inc.*, No. 05-4182, 2006 WL 1117878, at *3 (E.D. Pa. April 26, 2006).

Moreover, a diverse spectrum of affirmative defenses is available to WMPA in this action, and unique combinations of these defenses apply to each of Plaintiffs' proposed class representatives as well as to groups of proposed class members. This belies the notion that the claims brought by Plaintiffs in this case are in any way "typical." *See Ritti*, 2006 WL 1117878, at *6 (quoting *Jones v. GPU, Inc.*, 234 F.R.D. 82, 98 (E.D. Pa. 2005)) ("Where the defendant can raise unique defenses to each plaintiff's claim, typicality may not exist if the defenses could threaten to become the focus of the litigation."). In particular, defenses of release and accord and satisfaction (many proposed class members received settlement proceeds from a 1998 nuisance class action involving the Tullytown Landfill and released present and future claims); quasi-estoppel (many proposed class members received disbursements out of host fees paid by WMPA to Tullytown Borough); intervening cause (many proposed class members reside near a variety of alternate sources of odor); and "coming to the nuisance" (many proposed class members have elected to reside near the Tullytown Landfill despite knowing of its existence and operations) apply in varying configurations to proposed class members and class representatives alike. These defenses do not merely *threaten to be the focus* of the litigation; it is abundantly clear that they *will be a primary focus* of the litigation, along with numerous other individualized determinations as to alleged liability and damages.

For the same reasons noted above and detailed below, Plaintiffs' proposed class cannot meet the "ascertainability" requirement of Fed. R. Civ. P. 23. Specifically, proposed class

1767578.5 08/28/2015

members cannot be ascertained without conducting a series of mini-trials to determine whether a given proposed class member suffered a significant, unreasonable interference of a continuing nature that has produced a permanent or long-lasting effect. *See Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013). In *Carrera*, Judge Scirica vacated and remanded a district court's certification of a class because individualized fact-finding would have been necessary to show that each class member purchased and used a particular diet supplement. *Id.* at 312. In rejecting class certification, the Third Circuit observed that the proposed class could not be ascertained from the defendant's records, and held that the submission of affidavits by purported class members was not an acceptable way to satisfy the Rule 23 ascertainability requirement. *Id.* at 309. The same logic applies with equal force here, in that Plaintiffs argue that self-serving declarations or "resident data sheets" from proposed class members suffice to prove that they – and every other resident within the 9.1 square mile proposed class area – have been unreasonably and significantly impacted by alleged odors from the Tullytown Landfill. As in *Carrera*, this flawed approach to evaluating ascertainability of the class should be rejected.

As detailed below, Plaintiffs have failed to demonstrate that the named Plaintiffs are adequate class representatives or that the claims and defenses relating to these proposed representatives are typical of the proposed class; have failed to establish that common questions and issues predominate over individualized issues; and have failed to show that the proposed class is ascertainable. Because Plaintiffs have fundamentally failed to meet their burden to justify the use of the class action mechanism pursuant to Fed. R. Civ. P. 23, Plaintiffs' Motion for Class Certification should be denied.

1767578.5 08/28/2015

## II.   SUMMARY OF KEY FACTS.

### A.   The Tullytown Landfill and WMPA's Host Fee Payment Obligations.

WMPA owns and operates the Tullytown Landfill, which began accepting waste in 1989. Declaration of Barry T. Sutch ("Sutch Declaration"), Ex. 6, at ¶¶ 2, 5. The Landfill is located on the Pennsylvania side of the Pennsylvania-New Jersey border, is permitted to accept municipal waste, including biosolids, pursuant to permits and permit renewals periodically applied for by WMPA and issued by PADEP. *Id.* ¶¶ 6, 7. WMPA's operating permit for the Tullytown Landfill was most recently renewed in May 2015. *Id.* ¶ 13. With less than two years of disposal capacity remaining, and in accordance with its most recent permit renewal, the Tullytown Landfill will cease operations in or before May 2017. *Id.* ¶¶ 12, 13, 14.

As a result of negotiations between WMPA and local governments in the original permit approval process for the Tullytown Landfill, WMPA makes "host fee" payments to Tullytown Borough, Falls Township, and Bucks County, Pennsylvania.[1] *See* Roddewig Report, Ex. 3, at ¶ 80. Since 2010, WMPA has paid more than $37 million in host fees to these municipalities. *Id.* The host fees are used for a variety of purposes, including the issuance of "property improvement allocation" checks to the residents of Tullytown Borough. *Id.* ¶ 81. Since at least 2013, the allocation checks have been in the amount of $6,000 per year per property. *Id.* ¶ 82.

---

[1]   These "host fee" negotiations between WMPA and the Tullytown Landfill's host communities were premised upon Section 1301 of Pennsylvania's Municipal Waste Planning, Recycling and Waste Reduction Act, 53 P.S. §§ 4000.101 *et seq.* (commonly known as "Act 101"). Act 101 calls for the payment of a minimum $1 per ton "host municipality benefit fee" to communities in which landfills operate. 53 P.S. § 4000.1301. The fees negotiated and paid by WMPA in connection with operating the Tullytown Landfill have far exceeded this $1 per ton minimum requirement.

8

**B.**     **WMPA's 1998 Settlement in *Carnival v. WMX Technologies, Inc., et al.***

In December 1997, a proposed class of property owners in and around Florence, New Jersey filed a class action complaint in New Jersey federal court against WMPA claiming – just as Plaintiffs have claimed here – alleged loss "of the reasonable use and enjoyment of their homes" and "diminution of market value" due to odors from the Tullytown Landfill. *See* Roddewig Report, Ex. 3, at ¶ 86 (quoting *Carnival, et al. v. WMX Technologies, et al.* (D.N.J.) Complaint). In late 1998, WMPA and the proposed class settled, and the settlement was approved by the Court on December 23, 1998. *See* Stipulation of Settlement (the "1998 Stipulation"), Ex. 7. WMPA paid $3.1 million to settle the matter, and the settlement was executed by WMPA and by "each named plaintiff and each member of the putative class . . . ." as parties. 1998 Stipulation, Ex. 7, at 1. The 1998 Stipulation provided that it "shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties." *Id.* ¶ 13(g). The 1998 Stipulation expressly released "any and all manner of civil or administrative actions, causes of actions, [or] suits . . . foreseen or unforeseen, matured or unmatured, known or unknown, accrued or not accrued which the Class Members . . . ever had, now have, or can have, or shall or may hereafter have . . . concerning the [Tullytown Landfill] . . . ." *Id.* at ¶ 7. This release applied to all proposed class members who had any interest in real property within the *Carnival* proposed class area. *Id.* at ¶ 2(e).

Notably, the entire proposed class area in *Carnival* was within the boundaries of Plaintiffs' proposed class area in this case. *See* Roddewig Report, Ex. 3, at ¶ 87. Indeed, a number of proposed class members here, as well as at least one proposed class representative, participated in the *Carnival* settlement, received settlement funds from WMPA, and agreed to be bound by the 1998 Stipulation. *See, e.g.*, *Carnival* Settlement Claimant Listing Excerpts, Ex. 8.

1767578.5 08/28/2015

While the 1998 Stipulation specifically required that WMPA be notified of any alleged breach of the 1998 Stipulation "either by first class mail, overnight delivery or in person to each person signing this Stipulation," WMPA has never received any notice of alleged breach of the 1998 Stipulation from any party to the *Carnival* settlement at any time since the settlement. 1998 Stipulation, Ex. 7, at ¶ 13(h); Sutch Declaration, Ex. 6, at ¶ 10.

### C. PADEP's 2014 Notice of Violation Issued to WMPA and the Consent Assessment of Civil Penalty.

In mid-2014, shipments of biosolids received by the Tullytown Landfill for disposal increased in volume. Sutch Dep., Ex. 9, at 124:12-13. The generators of these biosolids shipments to the Tullytown Landfill misrepresented their odor level in documentation provided to WMPA. *Id.* at 119:8-13. Upon discovery of this issue, WMPA took steps to reduce the volume of biosolids shipments, in order to reduce odors they caused. *Id.* at 120:24-121:4.

On October 6, 2014, PADEP issued a Notice of Violation ("2014 NOV") to WMPA relating to the odors created by the increased biosolids shipments to the Tullytown Landfill. Sutch Declaration, Ex. 6, at ¶ 11. No other NOVs have ever been issued by PADEP for odors at the Tullytown Landfill. *Id.*

Following PADEP's issuance of the 2014 NOV, WMPA undertook a wide range of measures at the Tullytown Landfill to reduce odors, including accelerated installation of additional gas wells and other gas collection system enhancements, application of additional cover material over the waste, use of odor-control products, and ongoing reduction and eventual cessation of intake of biosolids. Sutch Dep., Ex. 9, at 100:20-101:23; 128:3-8. Other operational changes were also implemented, including alteration of hours of operation. *Id.* 128:8-11. In short, WMPA "spared no expense" to address the odors caused by the biosolids. *Id.* 128:14.

1767578.5 08/28/2015

On August 3, 2015, WMPA and PADEP executed a Consent Assessment of Civil Penalty, pursuant to which WMPA agreed to pay a penalty to collectively resolve the odor issues identified by PADEP in the 2014 NOV, as well as other issues relating to leachate storage and transport at the Tullytown Landfill and two other nearby WMPA facilities. *See* Consent Assessment of Civil Penalty ("CACP"), Ex. 10. In the CACP, WMPA specifically declined to agree with PADEP's characterizations as to odors from the Tullytown Landfill perceived in Florence, New Jersey between September 2014 and May 2015, and further, the parties specifically stated that they "do not authorize any other person to use the findings in this CACP in any matter or proceeding." *See* CACP, Ex. 10, at ¶¶ 3.a., 3.b.[2]

### D.    Alternative Odor Sources in the Proposed Class Area.

As catalogued in the reports of WMPA's experts, as well as in the deposition testimony of Plaintiffs' proposed class representatives, there is no question that Plaintiffs' proposed class area is replete with sources of odor other than the Tullytown Landfill, including a wide variety of both manmade industrial/commercial and natural sources.

Manmade alternative sources of odor include the Florence Wastewater Treatment Plant, the Garelick/Tuscan dairy farm operation, biosolids holding tanks in Florence Township, the Roebling Power Plant, several area Superfund and RCRA sites (including the Roebling Steel Company Superfund site, the Griffin Pipe Products site and the Safety-Kleen site), the Silvi

---

[2]    In any event, this Court owes no deference to PADEP's findings in the CACP. *See Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 527 (3d Cir. 1995), *as amended* (Oct. 24, 1995) ("[D]istrict courts have discretion to determine how much deference to accord the administrative proceedings, and although district courts must consider administrative findings of fact, [they are] free to accept or reject them.") (internal quotation omitted); *see also Cnty. of Berks*, 66 Pa. D. & C. 4th at 446 (holding that 17 odor-related NOVs issued by PADEP did not give rise to actionable nuisance claim against defendant landfill).

cement plant and the Trap Rock Industries asphalt plant. *See* Roddewig Report, Ex. 3, ¶¶ 39, 63, 66; Rappolt Report, Ex. 4, at 13-16, Appendices C, D. Natural alternative sources of odor in and around Plaintiffs' proposed class area include a host of local marshes, wetlands, riverbanks, stagnant ponds and the like, among them, odors from the Delaware River at low tide. Batties Dep., Ex. 11, at 19:16-20; Smith Dep., Ex. 12, at 39:14-19; Rappolt Report, Ex. 4, at 13-16, Appendix E.

WMPA's odor perception research scientist expert, Dr. Pamela Dalton, described in her expert report that many of the odors reported on the "resident data sheets" collected by Plaintiffs' counsel describe odors perceived by proposed class members that are not consistent with landfill odors. Expert Report of Dr. Pamela Dalton ("Dalton Report"), Ex. 5, at 4. For example, Dr. Dalton noted that "respondents to the survey residing in Levittown" described odors as "'chemical, bleach, burning chemicals, oil refinery, electrical fire smell and burning plastic.' In contrast, respondents to the odor survey in Florence and Roebling describe the smells as 'trash, manure, raw sewage, sour, sour milk, fecal and urine.'" *Id.* Indeed, Plaintiffs' purported expert, Bard Horton, acknowledged in his deposition that some of these odors would not appear to be associated in any way with a modern operating landfill. Horton Dep., Ex. 1, at 52:7-11.

### E. Plaintiffs' Proposed Class Representatives.

Plaintiffs have identified four proposed class representatives: John Batties, Caroline Smith, Sharon Mack, and Shirl Lynn Birely.

#### 1. John Batties: *Carnival* Settlor With No Complaints.

Mr. Batties purchased his home in Florence, New Jersey in 1978 and has lived there ever since. Batties Dep., Ex. 11, at 5:15-25; 6:1-2; 13:20-24. Mr. Batties acknowledged at his deposition that he was a participant in the 1998 settlement of the *Carnival* action. *Id.* at 6:21-

7:1; 10:15. Mr. Batties also acknowledged that the 1998 Stipulation in the *Carnival* action contains language releasing any future claim by him against WMPA related to the Tullytown Landfill. *Id.* at 8:21-25; 9:4-9.

Mr. Batties testified that he has not suffered any damages related to the Tullytown Landfill; that he enjoys living in his home; has no complaints about his home; grills outside; hosts friends and family at his home in the summertime who have never complained of odors; and has no intention to sell his house. *Id.* at 15:6-9 ("Q: Do you enjoy living in your home? A: Yes. Q: Any complaints? A: No."); 18:15-25; 19:21-23; 21:13-17. Mr. Batties further testified that he has visited River's Edge Park, Florence Yacht Club, and Colonial Memorial Park in Florence, New Jersey – each of which are directly across the Delaware River from the Tullytown Landfill – and that they are enjoyable places to visit. *Id.* at 19:1-12.

Mr. Batties additionally testified at his deposition that as of that day, he had never seen Plaintiffs' Amended Complaint and had only seen Plaintiffs' original Complaint for the first time earlier the same day. *Id.* at 22:22-23:9.

### 2. Caroline Smith: Enjoys Living in Florence.

Ms. Smith testified at her deposition that she is "happy" with her home in Florence, New Jersey and does not regret buying it. Smith Dep., Ex. 12, at 21:4-7. She has made no efforts to sell her house. *Id.* at 45:8-10. In fact, she enjoys living in Florence so much that she persuaded her sister to move to Florence from Toms River, New Jersey. *Id.* at 48:19-49:3. Like Ms. Smith, her sister enjoys living in Florence. *Id.* Ms. Smith testified that she and her children play outside, *id.* at 25:5-23; that they use the pool in their backyard, *id.* at 17:5-6; that she has friends over to swim in the pool as much as possible "between work and life," *id.* 25:18-23; and that she and her mother sit on her porch from time to time, *id.* at 25:5-8. Ms. Smith and her children also

13

use and enjoy River's Edge Park, located on the Delaware River in Florence, which Ms. Smith described as "nice" and "beautiful." *Id.* at 12:8-13:21.

Ms. Smith testified about only isolated, minor odor annoyances that she attributes to the Tullytown Landfill, in the form of two or three occasions when she had people over to her house and they had to go inside. *Id.* at 47:16-21. Ms. Smith also acknowledged in her deposition testimony that she had actual knowledge of the location of the Tullytown Landfill and of local odors before she closed on the purchase of her home in Florence, when she described that she noticed a smell, asked the sellers what it was, and was told that the sellers believed it to be the landfill across the Delaware River. *Id.* at 22:14-23. Ms. Smith further acknowledged, however, that she lives close to the Florence Township Wastewater Treatment Plant, and that she is "not sure" whether she is able to distinguish between odors from that facility and from the Tullytown Landfill. *Id.* at 39:25-40:5.

Ms. Smith further testified that, despite being identified as a proposed class representative, she had never seen the original Complaint or the Amended Complaint in this action prior to her deposition. *Id.* at 35:10-19; 36:15-19.

### 3. Sharon Mack: Only Mildly Inconvenienced.

Ms. Mack, who resides in Levittown, Pennsylvania, testified at her deposition that she has a patio and porch at her home that she uses as often as she can, and that friends and family come over for picnics. Mack Dep., Ex. 13, at 15:17-23. She testified that that she has been aware that the Tullytown Landfill "has been there my whole life." *Id.* at 19:19-22. Ms. Mack noted a few minor odor annoyances relating to the Tullytown Landfill, including one occasion on which Ms. Mack had to move a Fourth of July picnic indoors due to perceived landfill odors. *Id.*

1767578.5 08/28/2015

at 18:17-24. She also complained about occasionally having to go indoors while grilling, and about seagulls that drop chicken bones in her yard. *Id.* at 34:17-35:1.

Like Plaintiffs' other proposed class representatives, Ms. Mack testified that she had never seen the Amended Complaint filed in her name until the day of her deposition. *Id.* at 30:20-31:7.

### 4. Shirl Lynn Birely: Renter No More in the Proposed Class Area.

Ms. Birely testified at her deposition that she formerly rented an apartment in Tullytown, Pennsylvania and now lives in Fairless Hills, Pennsylvania, which is located well outside Plaintiffs' proposed class area. Birely Dep., Ex. 14, at 6:11-15, 8:12-13; *see* Roddewig Report, Ex. 3, at ¶ 18. Ms. Birely also testified that she did not know whether she had seen either the original Complaint or the Amended Complaint in this action filed in her name before her deposition. Birely Dep., Ex. 14, at 33:22-36:2.

## III. QUESTIONS PRESENTED.

1.     Whether Plaintiffs' proposed class meets the rigorous prerequisites established by Federal Rule of Civil Procedure 23(a) and (b), as set forth below, for certification of a class?

*Suggested Answer: No.*

2.     Whether Plaintiffs' proposed class representatives are able to fairly and adequately represent the interests of the proposed class, and whether these representatives have claims, and are subject to defenses, that are typical of those of the proposed class?

*Suggested Answer: No.*

3.     Whether questions of law or fact that are common to proposed class members predominate over individualized questions specific to individual members?

*Suggested Answer: No.*

1767578.5 08/28/2015

4.      Whether the proposed class is sufficiently ascertainable to be certified?

*Suggested Answer: No.*

5.      Whether the purported expert "opinions" and "reports" proffered by Plaintiffs survive the rigorous analysis requirement of Rule 23 and support class certification?

*Suggested Answer: No.*

## IV.    ARGUMENT.

### A.      Requirements for Class Certification Pursuant to Fed. R. Civ. P. 23.

Federal Rule of Civil Procedure 23 imposes two major hurdles before a class can be certified.  The first hurdle – set forth in Rule 23(a) – states that a class will only be certified if:

(1)      the class is so numerous that joinder of all members is impracticable;

(2)      there are questions of law or fact common to the class;

(3)      the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)      the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  All four of these requirements – numerosity, commonality, typicality, and adequacy of representation – are independent prerequisites to class certification, in addition to the requirement that the proposed class be ascertainable.  *Wal-Mart*, 131 S. Ct. at 2548; *Carrera*, 727 F.3d at 306.

If all of the above requirements are met, Plaintiffs must next overcome the Rule 23(b) hurdle, which requires a showing that the proposed class comports with one of three justifications for use of the class action mechanism.  Plaintiffs contend that they satisfy Rule 23(b)(3), which states that a class action is justified only if "common questions of law or fact

16

predominate over any questions affecting only individual class members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); Pls.' Motion at 16-17.

This Court has pronounced that "[t]o certify a class under Rule 23(b)(3), Plaintiffs must show *both* that common questions of law and fact predominate over questions unique to individual Plaintiffs, and that a class action is superior to other methods of adjudication." *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418, at *4 (E.D. Pa. Aug. 3, 2007) (emphasis added). Like the requirements of Rule 23(a), the Rule 23(b)(3) requirements of predominance and superiority must be evaluated rigorously. *Ritti*, 2006 WL 1117878, at *4. As part of its rigorous analysis, this Court should consider the merits of Plaintiffs' nuisance and negligence claims, because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Neale*, 2015 WL 4466919, at *13 (quoting *Wal-Mart*, 131 S.Ct. at 2552).

Finally, in the context of evaluating whether to grant a motion for class certification, this Court has specifically cautioned that the movants' Rule 23 arguments must be premised upon actual demonstrable evidence and not upon mere speculation. *See Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co.*, No. 12-3824, 2013 WL 6145117, at *4 (E.D. Pa. Nov. 20, 2013). In other words, all facts required to support class certification must be found in the record, and not merely anticipated or assumed to exist.

1767578.5 08/28/2015

**B.** **Plaintiffs' Proposed Class Representatives Are Inadequate And Have Claims, And Are Subject To Defenses, That Are Not Typical of Proposed Class Members, Which Precludes Class Certification.**

In evaluating the propriety of class certification, the Court must consider whether the proposed class representatives have the ability to represent and protect the interests of the proposed class in a fair, adequate and vigorous manner. *See* Fed. R. Civ. P. 23(a)(4); *Ritti*, 2006 WL 1117878, at *5. The Court must also consider whether the claims of the proposed class representatives, and the defenses to which they may be subject, are typical of the claims and defenses of the class or are somehow unique. *See* Fed. R. Civ. P. 23(a)(4); *Ritti*, 2006 WL 1117878, at *6. This typicality requirement essentially demands that the interests of the named plaintiffs align with the interests of potential class members. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 182-83 (3d Cir. 2001). Here, for a whole host of reasons, none of the proposed class representatives possess the ability to adequately represent the proposed class, and each is subject to a unique and atypical combination of defenses. For these reasons, Plaintiffs have failed to meet their rigorous burden under Rule 23(a), and class certification should be denied.

### 1. The Proposed Class Representatives Have Either Suffered No Damages Or, At Worst, Slight Inconveniences.

A credible allegation of damages supported by actual evidence, and not mere speculation or assumption, is a fundamental prerequisite to any proposed class representative's ability to adequately represent the proposed class. *See Mylan Pharmaceuticals*, 2013 WL 6145117, at *4; *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596 (3d Cir. 2012). Moreover, a defendant cannot be subject to nuisance liability unless the alleged interference or invasion at issue inflicts *significant harm* to the plaintiff. *See* Restatement § 821F ("There is liability for a nuisance only to those to whom it causes significant harm . . . ."). *See also Karpiak v. Russo*, 676 A.2d 270,

18

272-73 (Pa. Super. 1996). A harm will not be deemed significant if it only involves "slight inconvenience or petty annoyance." *See* Restatement § 821F, comment C. Rather, "there must be a real and appreciable invasion of the plaintiff's interests." *Id.*

Here, Mr. Batties is not an adequate class representative because he readily acknowledged in his deposition that he has suffered no harm of any kind as a consequence of any alleged odors emanating from the Tullytown Landfill. *See* Batties Dep., Ex. 11, at 15:6-9; 18:15-25; 19:1-12; 21:13-17 (testifying that he has no complaints about his home; friends and family have no complaints when visiting his home; he grills outside and has people over for gatherings in the summertime; and that the parks in Florence are enjoyable places to visit).

Likewise, Ms. Smith and Ms. Mack are inadequate class representatives because their deposition testimony demonstrates that they have only been, at worst, slightly inconvenienced by odors alleged to be emitted from the Tullytown Landfill. Specifically, Ms. Smith testified only that, on two or three occasions when she had people over to her house, they had to go inside. Smith Dep., Ex. 12, at 47:16-21. Ms. Mack similarly identified nothing more than mild annoyances arising from alleged landfill odors, such as having to move a Fourth of July picnic indoors and occasionally having to go indoors while grilling outside. Mack Dep., Ex. 13, at 18:17-24; 34:17-35:1. Absent any evidence even remotely approaching "significant harm," Ms. Smith and Ms. Mack cannot adequately represent the proposed class.

### 2. One Proposed Class Representative Does Not Even Reside in the Proposed Class Area.

Ms. Birely is not an adequate class representative because she no longer resides within the proposed class area. Birely Dep., Ex. 14, at 6:11-15, 8:12-13; *see* Roddewig Report, Ex. 3, at ¶ 18. Plaintiffs alleged in their Amended Complaint that the proposed class representatives, including Ms. Birely, sought to represent a proposed class of members defined as "all

owner/occupants and renters of residential property" within a geographic area identified in the Amended Complaint. Am. Compl. ¶ 19. While Ms. Birely formerly rented an apartment in Tullytown, Pennsylvania, she now lives outside of the proposed class area and therefore cannot adequately protect the interests of class members within the proposed class area.

### 3. Certain of the Proposed Class Representatives Have "Come to the Nuisance."

Ms. Smith and Ms. Mack are also inadequate class representatives, and are subject to defenses atypical of members of the proposed class, because they both unequivocally "came to the nuisance." *Ritti*, 2006 WL 1117878, at *6 (holding class representative to be inadequate because his claims were subject to unique defenses). Under both Pennsylvania and New Jersey law, liability for nuisance may not attach where a plaintiff was "fully aware of the surrounding situation" and purchased their home in the vicinity of "an annoyance they have freely assumed." *Waschak v. Moffat*, 109 A. 2d 310, 316 (Pa. 1954). *See also Lyons v. Twp. Of Wayne*, 888 A.2d 426, 437 n. 3 (N.J. 2005); *Weber v. Pieretti*, 178 A.2d 92, 104 (N.J. Super. Ct. Ch. Div. 1962); *Benton v. Kernan*, 21 A.2d 755, 758 (N.J. Super. Ct. App. Div. 1941) (under New Jersey law, "coming to the nuisance" is "an element to be considered in determining the reasonableness" of a purportedly actionable interference).

As revealed in the depositions of the proposed class representatives, there is no dispute that Ms. Smith had actual notice of the existence of the Tullytown Landfill and of local odors in Florence, New Jersey before she purchased her home there. Smith Dep., Ex. 12, at 22:14-23. Likewise, Ms. Mack freely "came to the nuisance" in choosing to reside in Levittown, Pennsylvania, given that she knew of the existence of the nearby Tullytown Landfill her "whole life." Mack Dep., Ex. 13, at 19:19-22.

20

### 4. Certain of the Proposed Class Representatives Are Subject to the 1998 *Carnival* Release.

Mr. Batties was a party to the 1998 settlement of the *Carnival* action, in which he expressly released the claims he is currently attempting to assert as a proposed class representative against WMPA. Ms. Smith purchased her home from parties to the *Carnival* settlement, and as their successor in interest, has likewise released the claims she is currently attempting to assert as a proposed class representative. Because Mr. Batties and Ms. Smith are subject to unique forms of release and/or accord and satisfaction defenses, they are situated in a manner that is atypical relative to much of the proposed class, and are inadequately equipped to effectively represent the interests of the proposed class.

A release will function to bar future claims if the release (1) applies to the plaintiff(s), (2) circumscribes the asserted claims, and (3) is legally enforceable. *Elite Sportswear Products, Inc. v. New York Life Ins. Co.,* No. 05-cv-5181, 2006 WL 3052703, at *6 (E.D. Pa. Oct. 24, 2006). If a release in a class action settlement meets these requirements when read according to its plain terms, it will be enforced even if it contains very broad language. *See McGowan Investors LP v. Keefe Bruyette & Woods, Inc.,* 540 F. Supp. 2d 571, 577-78 (E.D. Pa. 2008) ("The Third Circuit consistently finds broad release language in class action settlement orders legally enforceable.").

Here, the release in the 1998 Stipulation resolving the *Carnival* case applied to the "Class" and the "Class Members," defined as "each and every individual, partnership, public or private corporation, firm, business, government entity, estate, trustee, receiver, executor, administrator who owned, occupied, had any interest in or controlled any [real property] that was located . . . within the Class Area at any time during the Class Period." 1998 Stipulation, Ex. 7, at ¶ 2(e). The release expressly extended to "any and all manner of civil or administrative actions, causes of actions, [or] suits . . . foreseen or unforeseen, matured or unmatured, known or

21

unknown, accrued or not accrued which the Class Members . . . ever had, now have, or can have, or shall or may hereafter have . . . concerning the [Tullytown Landfill] . . . ." *Id.* at ¶ 7. Mr. Batties was an individual with an interest in real property in the class area, and the terms of the release are plainly enforceable to foreclose his current claims against WMPA.

With regard to Ms. Smith, the 1998 Stipulation expressly bound successors to *Carnival* settlors to the terms of the settlement, including the release provision. While the term "successor" was not defined in the 1998 Stipulation, this term is commonly understood to mean "[a] person who succeeds to the office, rights, responsibilities, or place of another; one who replaces or follows another." Black's Law Dictionary at 1446 (7th ed. 1999).

Ms. Smith purchased her home in Florence, New Jersey from sellers David and Marianne Ritter, who were both settling parties in the *Carnival* case. Smith Dep., Ex. 12, at 23:1-5; *Carnival* Settlement Claimant Listing Excerpts, Ex. 8. Ms. Smith thereby succeeded to the real property interests of the Ritters, and the terms of the release in the 1998 Stipulation arguably apply to preclude her current claims against WMPA. Because both Mr. Batties and Ms. Smith are bound by the terms of the release in the 1998 Stipulation in different ways, they do not constitute adequate class representatives and they are subject to unique defenses not typical of the proposed class.

1767578.5 08/28/2015

**C.    Individualized Questions of Law and Fact Among Proposed Class Members Overwhelmingly Predominate Over Common Issues, Which Precludes Class Certification.**

Even if Plaintiffs' request for class certification could survive this Court's rigorous analysis of the requirements established by Rule 23(a) – which it cannot – Rule 23(b) imposes an additional burden on Plaintiffs, to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). To meet this requirement, Plaintiffs must show that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Marcus*, 687 F.3d at 600 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). As the Third Circuit recently observed, "[p]redominance begins, of course, with the elements of the underlying cause of action. . . . because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *Neale*, 2015 WL 4466919, at *13 (internal citations and quotations omitted).

Plaintiffs attempt to argue that they have met the predominance requirement of Rule 23(b) because their nuisance claims turn on the "objective perception" of a "normal person in the community" and because a short list of "key issues and evidence apply classwide." Pls.' Motion at 18-20. The remainder of Plaintiffs' Rule 23(b) argument attempts to rebut the notion that individualized damages calculations preclude class certification. *Id.* at 20-21. Plaintiffs' superficial treatment of the Rule 23(b) predominance requirement ignores a panoply of individualized liability issues, however, and wholly fails to explain how Plaintiffs believe the elements of their case could be established through common proof. *See In re OSB Antitrust Litig.*, 2007 WL 2253418, at *4. *See also Grubb v. Nucor Steel Mansion*, No. 3:14-cv-158, slip op. at 3-4 (N.D. Oh. Aug. 24, 2015) (denying class certification on the basis that "none of this

supposedly common proof is in the record" and "if the evidence exists, this Court has no basis for concluding which portions of Plaintiffs' claims (if any) could be established using common proof") (attached hereto as Exhibit 15).

Plaintiffs' proposed class is plagued by numerous issues that would require extensive and inefficient individualized fact-finding by this Court, that are not susceptible to common proof, and that overwhelm any commonalities among the claims of proposed class members that Plaintiffs have attempted to identify. These issues include, as examples:

- The "resident data sheets" collected by Plaintiffs' counsel, WMPA's odor survey reports, and Mr. Rappolt's air modeling analyses all confirm that odors occur in the proposed class area sporadically in both time and space, and do not affect portions of the proposed class area at all or affect it in markedly different ways, even at maximum potential impacts, which significantly complicates evaluation of proof of alleged nuisance (*see* Exs. 4, 16, 17);

- Approximately 65 man-made alternative sources of odor as well as thousands of acres of natural alternative sources of odor exist within the proposed class area, significantly complicating nuisance liability determinations and requiring granular analyses that will vary on a block-to-block basis within the proposed class area (*see* Rappolt Report, Ex. 4, at 13-16);

- The claims of hundreds of proposed class members residing in New Jersey are arguably barred by the terms of the release provision in the 1998 Stipulation in the *Carnival* case settlement in which proposed class members and/or their predecessors relinquished all future claims relating to Tullytown Landfill odors (*see Carnival* Settlement Claimant Listing Excerpts, Ex. 8);

- Hundreds of proposed class members residing in Pennsylvania are estopped from pursuing their claims because they received "property improvement allocation checks" funded by WMPA through "host fees" paid to the municipalities in which the Tullytown Landfill operates (*see* 2013 Property Improvement Allocation Ordinance, Ex. 18);

- Proposed class members who moved into the proposed class area after the Tullytown Landfill commended operations in 1989 and/or after the 1998 *Carnival* settlement "came to the nuisance," so their claims will require an additional level of analysis of this potentially preclusive defense; and

- The calculation of each proposed class member's alleged damages, if any, would require individualized evaluations taking into account a wide variety of individual variables, destroying any possibility of classwide damages calculations for nuisance and negligence claims.

Each of these issues is addressed in further detail below.

### 1. Individualized Questions As to Odor Impacts and Nuisance.

Nuisance is a deeply personal tort, requiring proof of unreasonable encroachment on an individual's interest in the private use and enjoyment of his or her property. Restatement § 822. Not every encroachment constitutes a nuisance, however, and only a defendant's unreasonable encroachment causing "significant harm" is actionable. *See Karpiak*, 676 A.2d at 272–73 (adopting Restatement § 821F). As such, to establish an odor nuisance claim, Plaintiffs must do more than merely point to the existence of odors. *See Cnty. of Berks*, 66 Pa. D. & C. 4th at 446 (dismissing plaintiffs' nuisance claim relying on 17 PADEP odor-related NOVs). In short, Pennsylvania's "significant harm" requirement necessarily begs several individualized questions, and by their very nature, nuisance claims present challenges in terms of attempting to evaluate proof on a classwide basis.

Here, Plaintiffs rely on "resident data sheets" solicited by their counsel and completed by proposed class members in support of their contention that common factual issues predominate over individualized issues. But even assuming that these "resident data sheets" would be admissible – despite being unreliable hearsay statements – they actually undermine Plaintiffs' class certification arguments. Mr. Roddewig, WMPA's real estate appraisal expert, has estimated that there are 8,275 residential parcels in the proposed class area. Roddewig Report, Ex. 3, at ¶ 21. Plaintiffs produced a total of 493 "resident data sheets," meaning that *less than 6% of the property owners or renters in the proposed class area responded to the targeted mailer from Plaintiffs' counsel.* Even among the small fraction of proposed class members who

responded to counsel's solicitation, responses in the "resident data sheets" varied dramatically. At least twelve "resident data sheets" described alleged odors in a manner wholly inconsistent with odors one would associate with a landfill, and use descriptors such as "water treatment plant," "Dow chemical plant," "oil refinery," "electrical fire," and "sour milk" to describe the odors. *See* Resident Data Sheets, Ex. 16. At least six more proposed class members who completed "resident data sheets" stated that they did not notice any odors at all emanating from the Tullytown Landfill. *Id.* The remaining "resident data sheets" collected by Plaintiffs' counsel diverge significantly in terms of the duration and extent to which they state that alleged odors have impacted residents. *See* Pls.' Motion Ex. 13.

Any attempt to distill which, if any, of the 6% of residents in the proposed class area who completed "resident data sheets" experienced "significant" odor interferences could not be accomplished on a classwide basis, and would necessarily require individualized fact-finding. Even more problematic is the fact that Plaintiffs' proposed class is not even limited to the 493 individuals who completed "resident data sheets" – rather, Plaintiffs seek to include tens of thousands of residents within the proposed class area. *See* Pls.' Motion at 2-3. The individualized inquiries required in this regard would be overwhelming and would consume a tremendous amount of time and resources. While Plaintiffs boast that their "resident data sheets" constitute a representative sample of the odor experiences of proposed class members odors, the evidence of record points in exactly the opposite direction, and cripples Plaintiffs' ability to satisfy the predominance requirement of Rule 23(b).

The odor surveys conducted by WMPA at designated survey points both within and beyond the proposed class area over the past several years likewise illustrate that individualized issues as to alleged odor impacts abound in this case. These surveys show that on most days,

most portions of the proposed class area either experience no odors or minimal odors. *See* Odor Survey Samples, Ex. 17. Even those survey points where odors are detected more regularly vary widely from day to day due to wind direction, temperature, and other weather-related variables. In attempting to determine liability on a classwide basis, therefore, this Court would be faced with analyzing thousands upon thousands of items of odor survey data that point in different directions. This Court would further need to distill the odor survey data in a manner that would control for potential geographic, temporal, and seasonal fluctuations. While the odor surveys do provide an effective check on the subjectivity of Plaintiffs' "resident data sheets," they have no ability to prevent the Court from having to make individualized determinations of facts and issues as to the odor experience, if any, of each potential class member.

The highly variable and inconsistent impacts of alleged Tullytown Landfill odors on the proposed class area were captured and described by WMPA's air dispersion modeling expert, Mr. Rappolt, in his expert analysis and opinions. Mr. Rappolt first evaluated wind direction and wind speeds in the proposed class area, and concluded that odor impacts within that area are divergent as a result of meteorological variables alone. *See* Rappolt Report, Ex. 4, at 6; *see also* Dalton Report, Ex. 5, at 2. Mr. Rappolt additionally determined that the proposed class area contains scores of potential alternative sources of odors, both natural and man-made. Rappolt Report, Ex. 4, at 13-16. Mr. Roddewig made similar findings in this regard. Roddewig Report, Ex. 3, at ¶ 9. This multitude of alternative odor sources will inevitably necessitate individualized evaluation of the location of each proposed class member's residence relative to these alternative sources as part of any evaluation of nuisance liability.

Mr. Rappolt's preliminary air dispersion modeling exercise also illuminated the tremendous variability of odor events within the proposed class area. *See* Rappolt Report, Ex. 4,

at 24-25. Specifically, his preliminary modeling work indicated that various points within the proposed class area would experience odors to profoundly different potential degrees at different points in time, ranging from highest potential odor impacts in a nonresidential portion of the Pennsylvania portion of the proposed class area, to lowest potential impacts in the southeasternmost portion of the New Jersey portion of the proposed class area. *See* Rappolt Report, Ex. 4, at 24-25 ("In addition to showing the weakness of odors within the Proposed Class Area, the modeling also demonstrated that the maximum potential impact at locations within the Proposed Class Area occurred at different times, which indicates different experiences for the putative class members impacted during each event based on their location.").[3]

In sum, WMPA has developed extensive evidence in a variety of forms, even at this very preliminary stage of the case, of the dramatic variability in potential odor impacts experienced across the proposed class area. This evidence conclusively defeats any attempt on Plaintiffs' part to argue that the rigorous requirement of Rule 23(b) predominance can be met, and militates strongly against certification of a class.

2.      **Individualized Determinations as to the Effect of the 1998 *Carnival* Settlement and Release.**

As described above, in the putative class action case of *Carnival v. WMX Technologies, Inc.*, plaintiffs residing in and around Florence, New Jersey brought nuisance claims in New Jersey federal court very similar to those alleged here against WMPA relating to the Tullytown

---

[3] Plaintiffs' contention that subclasses could be used to organize the liability questions in this action, *see* Pls.' Motion at 20, completely ignores this evidence of the myriad spatial and temporal nuances of odor experienced within the proposed class area. Creation of subclasses would accomplish nothing in terms of alleviating the need for individualized determinations of liability to be made on a block-to-block, if not a property-by-property basis within the proposed class area given the wide variability of odor impacts and sources.

Landfill, asserting that odors prevented them "from enjoying their property, while also diminishing their ability to enjoy their usual and customary activities." *See* 1998 Complaint, Ex. 19, at 5-6. Following approximately a year of litigation, the case settled and WMPA agreed to pay $3.1 million to the putative class. The 1998 Stipulation memorializing the terms of this class action settlement contained a broad release of future claims relating to alleged Tullytown Landfill odors, enforceable against any participants in the settlement and their successors. As described above, proposed class representative Mr. Batties was a participant in the *Carnival* settlement, and proposed class representative Ms. Smith purchased her home from parties to the *Carnival* settlement. Batties Dep., Ex. 11, at 8:21-25; 9:4-9; Smith Dep., Ex. 12, at 23:1-5; *Carnival* Settlement Claimant Listing Excerpts, Ex. 8. WMPA's position is that the *Carnival* release bars all proposed class members residing within the 1998 Class Area from pursuing claims in the present action against WMPA, and that these individuals are simply not legally entitled to two bites from the same proverbial apple.

Given this, as a key liability issue in this action, the Court will need to make individualized determinations regarding whether the *Carnival* release applies to each proposed class member residing in New Jersey, whether as a *Carnival* settlor or as a successor to *Carnival* settlor. The necessity of such individualized determinations as to the effect of the *Carnival* settlement yet again illustrates the complete lack of Rule 23(b) predominance of facts and issues common to the proposed class.

### 3. Individualized Determinations as to Equitable Estoppel Based Upon Receipt of "Host Fee" Disbursements.

As noted above, over the course of its operation, WMPA has paid tens of millions of dollars to local municipalities as "host fees" pursuant to the Municipal Waste Planning, Recycling and Waste Reduction Act, known as "Act 101." *See* 53 P.S. § 4000.101 *et seq.* For

years, Tullytown Borough has, by local ordinance, passed some portion of these host fees on to its residents in the form of annual "property improvement allocation checks." *See, e.g.*, 2013 Property Improvement Allocation Ordinance, Ex. 18, at 2. Recently, these annual disbursements were in the amount of $6,000 per Tullytown Borough resident. *Id.* WMPA's position is that the receipt of these checks by Tullytown Borough residents within the proposed class area preclude recipients from pursuing claims against WMPA in this action on a theory of quasi-estoppel.

The doctrine of quasi-estoppel "operates to bar a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party." *Erie Telecomm., Inc. v. City of Erie*, 659 F. Supp. 580, 585 (W.D. Pa. 1987). The roots of the quasi-estoppel doctrine lie in fairness and equity; a plaintiff's claims will be estopped "where it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit." *Id.* (quoting *KTVB, Inc. v. Boise City*, 486 P.2d 992, 995 (Idaho 1971)). Here, receipt by certain proposed class members in Pennsylvania of "property improvement allocation checks" raises various issues requiring individualized analysis. Whether proposed class members residing in Tullytown Borough have received such checks, how long they have received checks, and the cumulative amount of any checks received are all facts relevant to the quasi-estoppel inquiry. Of course, analyzing these key liability issues simply cannot be done on a classwide basis. Instead, this Court will need to make individualized fact-finding determinations as to each Tullytown Borough resident given the lack of Rule 23(b) predominance of any commonality among proposed class members as to this issue.[4]

---

[4]    Again, Plaintiffs' proposal that creation of subclasses will address this issue is unavailing, and ignores that this issue is just one of numerous issues affecting different proposed class members in different ways. At a certain point, creating more and more subclasses would become a counterproductive exercise bordering on the absurd and defeating the entire premise of class action litigation. Plaintiffs cannot circumvent Rule 23(b)'s

30

### 4. Individualized Questions and Issues as to Assessment of Damages.

Plaintiffs concede that measuring damages in this action would necessarily require individualized determinations, but nevertheless contend that such a process would be "manageable," and list five "options" to address such calculations. Pls.' Motion at 20. Practically speaking, however, assessment of damages in this action if liability were established would be complicated by a very complex array of variables affecting property values within the proposed class area, by nuances in individual perception of odors among proposed class members, and by a wealth of other factors, and would simply not be administratively feasible.

In his expert report, Mr. Roddewig concluded that "there are no uniform, consistent, and common classwide real estate appraisal methods to measure the impairment, if any, to the properties comprising the proposed class." *See* Roddewig Report, Ex. 3, at ¶ 8. Plaintiffs have pointed to no evidence refuting this view. Instead, Plaintiffs merely state that "courts have many options for dealing with individual damages issues." Pls.' Motion at 20. Mr. Roddewig opined that, based on his professional experience, "the use, enjoyment, marketability, and real property impairments *must be analyzed and determined on a specific neighborhood by neighborhood and property by property basis*." Roddewig Report, Ex. 3, at ¶ 8 (emphasis added). Plaintiffs' proposals of "options" such as bifurcating liability and damages trials, appointing a special master to preside over damages proceedings, or creating subclasses simply do not adequately address the quagmire of determining damages for thousands of distinct properties within the proposed class area here. *See* Roddewig Report, Ex. 3, at ¶¶ 25-26 (explaining that "standards of professional appraisal practice specify a property-by-property process for determining the

---

rigorous requirements by proposing subclasses as a means to litigate individualized issues that have no business being certified on a classwide basis in the first place.

31

impact of environmental conditions on prices, rents and values and require market data analysis before forming such an opinion").

Dr. Dalton's expert opinions likewise undermine Plaintiffs' half-hearted attempts to argue that individualized damages determinations would be manageable in this case. In particular, Dr. Dalton concluded that "there are significant biological factors that produce variation in odor perception" and "there are significant psychological factors that lead to variation in odor perception and response." Dalton Report, Ex. 5, at 1. Due to the complex array of variables affecting odor perception, which is key to determining how much an individual's ability to "enjoy" one's property can be impaired due to odors, individualized damages determinations would need to account for each proposed class member's age, gender, olfactory system strength, odor exposure history, pre-existing attitudes, social influences/biases, and other factors. *See generally* Dalton Report, Ex. 5. None of Plaintiffs' suggested damages approaches even come close to allow for such a complex, but necessary, calculus.

In short, the need to perform detailed individual calculations of damages, incorporating a wide array of facts, issues and variables, destroy any Rule 23(b) predominance of common issues in this action among proposed class members. *See Ritti*, 2006 WL 1117878, at *12 ("individual damages calculations create a predominance problem") (citing *Porter v. Nations Credit Consumer Disc. Co.,* 229 F.R.D. 497, 500 (E.D. Pa. 2005)). For this reason, in addition to those enumerated above, class certification is inappropriate.

### D. Plaintiffs' Proposed Class is Not Ascertainable, Which Precludes Class Certification.

Plaintiffs argue that because their proposed class area is based solely on geography, it satisfies the ascertainability requirement of Rule 23. Pls.' Motion at 12-13. As recently explained by the Third Circuit, however, "[t]he ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015) (internal quotations omitted); *see also Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 184 (3d Cir. 2014) (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 359 (3d Cir. 2013) ("The ascertainability requirement focuses on whether individuals fitting the class definition may be identified without resort to mini-trials.").

Even if Plaintiffs' definition of the proposed class solely by reference to geographic boundaries may be deemed "objectively ascertainable," this is only one component of the ascertainability inquiry. By relying upon proposed class members to self-identify as having been affected by alleged odors emanating from the Tullytown Landfill via self-serving, unverifiable declarations or "resident data sheets," Plaintiffs' definition of the proposed class fails to meet the Third Circuit's second criterion, requiring a reliable and feasible mechanism for determining whether potential class members belong in the proposed class or not.

Put another way, given that the experience of odor is a fundamental prerequisite to Plaintiffs' odor nuisance claim, and given that not all persons within Plaintiffs' proposed class area will have experienced odors, the Court will essentially be forced to conduct threshold mini-trials as to whether each and every proposed class member has even experienced any odors. These determinations necessarily precede any analysis of whether any such odors constituted a

significant and unreasonable interference of a continuing or long-lasting nature, and thereby constituted an actionable nuisance. *See Plaza 22, LLC v. Waste Mgmt. of Louisiana, LLC*, No. 13-618-SDD, 2015 WL 1120320, at *3 (M.D. La. Mar. 12, 2015) ("A class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a particular person is a member of the class."). Similar inquiries on an individualized basis will be necessary to determine the applicability of a multitude of other threshold issues and defenses, as examples, whether a given proposed class member participated in the 1998 *Carnival* settlement, or whether a given proposed class member received disbursements of WMPA's "host fee" payments.

Notably, Plaintiffs' apparent proposal to use affidavits to identify potential class members who have been negatively impacted by alleged odors from the Tullytown Landfill, *see* Pls.' Motion at 13, would not relieve the Court from the burden of conducting mini-trials to identify class members who have actionable claims. Indeed, Plaintiffs' superficial description of their proposal fundamentally fails to appreciate the rigorous analysis that must be applied by the Court to determine whether the ascertainability requirement imposed by Rule 23 has been met. *See Carrera*, 727 F.3d at 306 (rejecting use of affidavits as a means to establish inclusion in a class of purchasers of a diet supplement); *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 318 ("A party's assurance to the court that it intends or plans to meet [Rule 23's] requirements is insufficient."). Simply put, Plaintiffs' proposal is not administratively feasible and would necessarily cause significant inefficiency, undermining the entire purpose of employing the class action mechanism. *See Carrera*, 727 F.3d at 307 ("If a class cannot be ascertained in an economical and administratively feasible manner . . . significant benefits of a class action are

1767578.5 08/28/2015

lost.") (internal citation and quotations omitted). For each of these reasons, Plaintiffs' proposed class is not sufficiently ascertainable as a matter of law, and class certification should be denied.

### E. Plaintiffs' Proffered Expert Opinions and Reports Fail To Survive the Rigorous Analysis Requirement of Rule 23, Thereby Failing to Support Class Certification.

The Third Circuit has articulated the following key principles as to the role of expert opinions in the Rule 23 class certification context:

> Expert opinion with respect to class certification, like any matter relevant to a Rule 23 requirement, calls for rigorous analysis. . . . It follows that opinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under *Daubert* or for any other reason. *See IPO*, 471 F.3d at 42 (rejecting the view that "an expert's testimony may establish a component of a Rule 23 requirement simply by being not fatally flawed" and instructing that "[a] district judge is to assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit"); . . . Under Rule 23 the district court must be "satisfied," . . . or "persuaded," . . . that each requirement is met before certifying a class.

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 323 (internal citations omitted). The Third Circuit has further stated that "[i]n addition to reliability, Rule 702 requires that the expert's testimony must assist the trier of fact. . . . admissibility depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742-43 (3d Cir. 1994) (quoting *U.S. v. Downing*, 753 F.3d 1224, 1237 (3d Cir. 1985)).

Here, the so-called "expert reports" submitted by Plaintiffs contain nothing more than outlines of future plans for study and analysis *if* a class is certified, and do absolutely nothing to help this Court decide whether the proposed class should in fact be certified. In preparing their "expert reports," neither Mr. Weeks nor Mr. Horton visited the Tullytown Landfill or the proposed class area. Horton Dep., Ex. 1, at 13:7-14; Weeks Dep., Ex. 2, at 12:9-11. Neither

reviewed many if any documents produced by WMPA, nor reviewed any materials in PADEP's files or communicated with any PADEP representatives. Horton Dep., Ex. 1, at 13:15-22; Weeks Dep., Ex. 2, at 13:7-16; 16:14-18; 23:23-24:7. Because the "expert reports" authored by Mr. Horton and Mr. Weeks on behalf of Plaintiffs offer no substantive opinions about anything, they cannot not assist this Court in determining whether the proposed class representatives are adequate or they are subject to typical defenses; whether common issues of fact or law or individualized issues predominate; whether the proposed class is ascertainable; or in resolving any other questions pertinent to class certification. As such, they fail to survive the rigorous scrutiny required by Rule 23, and are properly disregarded by the Court in their entirety in evaluating the propriety of class certification.

## V. <u>CONCLUSION.</u>

For each of the foregoing reasons, WMPA respectfully requests that this Court deny Plaintiffs' Motion for Class Certification, and enter any such other and further relief as the Court may deem just and proper.

1767578.5 08/28/2015

Respectfully submitted,

SAUL EWING LLP

/s/ John F. Stoviak
John F. Stoviak, Esquire
PA Atty. I.D. 23471
Cathleen M. Devlin, Esquire
PA Atty. I.D. 73680
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Telephone: 215-972-1095
Facsimile: 215-972-1921
jstoviak@saul.com
cdevlin@saul.com

Attorneys for Defendant
Waste Management of Pennsylvania, Inc.

Dated: August 28, 2015

1767578.5 08/28/2015

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Defendant Waste Management of Pennsylvania, Inc.'s Brief in Opposition to Plaintiffs' Motion for Class Certification* was served via the Court's electronic filing system and U.S. first-class mail on the following counsel of record:

Kevin S. Riechelson, Esquire
KAMENSKY, COHEN & RIECHELSON
194 S. Broad Street
Trenton, NJ 08608
(609) 394-8585
kriechelson@kcrlawfirm.com

Steven D. Liddle, Esquire
Nicholas A. Coulson, Esquire
LIDDLE & DUBIN, P.C.
975 E. Jefferson Avenue
Detroit, MI 48207
(313) 392-0025
ncoulson@ldclassaction.com

*Attorneys for Plaintiffs*

/s/ John F. Stoviak
John F. Stoviak, Esquire

Dated: August 28, 2015